## UNITED STATES DISTRICT COURT
## SOURTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TYLER TOMCZAK, Derivatively on Behalf of MGT INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> ROBERT B. LADD, H. ROBERT HOLMES and MICHAEL ONGHAI, <br><br> Defendants, <br><br> and, <br><br> MGT CAPITAL INVESTMENTS, INC. <br><br> Nominal Defendant. | Case No.:  19-8046 <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Tyler Tomczak ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant MGT Capital Investments, Inc. ("MGT" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

### NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of MGT against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties that occurred from October 9, 2015 through the present (the "Relevant Period") and have caused substantial harm to MGT.

2.     Here, Defendants presided over a scheme to hide the fact that the Control Group (as defined herein) was secretly manipulating the actions of MGT to: (i) enter into a sweetheart investing agreement that allowed for members of the Control Group to each individually acquire large blocks of the Company's stock, along with exercisable warrants that were designed to hide their control over the Company and allow each to leverage the eventual inflation of the Company's stock price into millions of dollars of illicit profits and (ii) engage in the publication of multiple promotional articles, paid for by the Company, which materially misled investors and drove outside interest into MGT, providing an audience for the Scheme Group's (as defined herein) stock sales.

3.     Further, certain members of the Control Group, with the knowledge of forthcoming positive news about the Company and/or the issuance of a promotional article, engaged in a series of coordinated pre-market trading to give the appearance of greater interest in MGT stock than actually existed at that time, all to further dupe members of the investing public.

4.     The purpose was simple: To artificially inflate MGT's stock price and allow the Control Group to exit their positions, taking millions of dollars in quick profits in exchange for the relatively small upfront investment.

5.     For his part, Defendant Robert B. Ladd ("Ladd"), then the Chief Executive Officer and Interim Chief Financial Officer of MGT, and one of just two Company employees, went along for the ride—mispresenting the ownership interest of the Control Group to hide the relationship

and agreement among its members to act in concert, while also taking hundreds of thousands of dollars in profits from stock sales timed to leverage the artificial inflation created by the promotional scheme.

6.      The truth about the Control Group's pump-and-dump tactics began to surface in September 2016 when the Company announced its receipt of an SEC subpoena.  Thereafter, Teri Buhl, a self-described "financial investigative journalist" who was named by The Huffington Post as one of "The Most Dangerous People in Financial Media"[1] began publishing several articles on her site linking the SEC probe to Honig and his affiliates and questioning whether Honig was involved in an undisclosed control group.

7.      The Scheme Group officially fractured in 2017 when Honig, along with several other members of the Control Group, brought suit against the Company and Defendant Ladd, alleging that the each failed to adequately enrich the members of the Control Group by effecting certain transactions and asset purchases that the Control Group itself had set up.

8.      Additionally, Honig sued Defendant Ladd and Ms. Buhl, claiming that the two had conspired to slander Honig through Buhl's reporting, as she had published several subsequent articles connecting MGT to Honig and the possibility of clandestine and nefarious pump and dump activities.

9.      Ms. Buhl's reporting was substantially corroborated when, on September 7, 2018, the SEC announced that it had filed a complaint against the Scheme Group, among others, alleging

---

[1]      *See* Brown, Joshua M., "The 25 Most Dangerous People in Financial Media," The Huffington Post, available at https://www.huffingtonpost.com/joshua-m-brown/best-financialjournalists_b_1605584.html?slideshow=true#gallery/5bb2c63ce4b0480ca65bce38/2 (last accessed March 15, 2019) ("[I]f you're up to no good in the financial services biz, you want Teri and her instinct for fraud-busting to be as far away from you as possible").

that they had improperly exploited MGT securities for illicit financial gain amounting to more than $9 million, all in violation of the federal securities laws.

## JURSIDICTION AND VENUE

10.     This Court has diversity jurisdiction over the action under 28 U.S.C. § 1332.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that has conducted business in and maintained operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court because many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District.

## THE PARTIES

**Plaintiff**

13.     ***Plaintiff Tyler Tomczak*** ("Tomczak') is, and was at relevant times, a shareholder of MGT.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a resident of Wisconsin.

**Nominal Defendant MGT**

14.     Nominal Defendant MGT is a Delaware corporation with principal executive offices at 500 Mamaroneck Avenue, Suite 320, Harrison, New York 10528 and 512 S. Mangum Street, Suite 408, Durham, North Carolina 27701 with a principal phone number of 914-630-7430. MGT stock trades on the OTCMKTS under the ticker symbol "MGTI."

**Director Defendants**

15.     **Defendant Robert B. Ladd** ("Ladd") joined the Company in December 2010 as a Director.  Ladd was appointed Interim President and CEO in February 2011, appointed President and CEO in January 2012 and appointed Interim Treasurer and Interim Chief Financial Officer in December 2015.  In August 2017, Ladd was appointed CEO of MGT.

16.     According to the Company's Schedule 14A filed with the SEC on August 15, 2016 (the "2016 Proxy Statement"), as of July 28, 2016, Defendant Ladd beneficially owned 2,540,000 shares of the Company's common stock, which was 9.77% of the Company's outstanding stock. Given that the price per share of the Company's common stock at the start of trading on May 18, 2016 was $5.23, Ladd beneficially owned $13.3 million worth of MGT stock.  Upon information and belief, Ladd is a resident of North Carolina.

17.     For the fiscal year ended December 31, 2015, Defendant Ladd received $288,000 in compensation from the Company on a $238,000 salary.  Broken down, for the fiscal year ended December 31, 2015, Defendant Ladd received $238,000 in cash and $50,000 in stock.

18.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Ladd made the following sales of Company stock (and made no purchases of Company stock).  On May 25, 2016, Defendant Ladd sold 157,300 shares of Company stock for $2.44 per share, yielding proceeds of $383,812.  On May 31, 2016, Defendant Ladd sold 33,603 shares of Company stock for $2.53 per share, yielding proceeds of $85,015. Thus, in total, while the stock price was artificially inflated and before the fraud was exposed, Ladd sold 190,903 MGT shares on inside information, for which he received $468,827.

19.     The peculiar timing of Defendant Ladd's trades, especially in light of his trading history, makes the above described sales of MGT stock unusual.  Defendant Ladd unloaded nearly

200,000 shares of MGT common stock, collecting nearly half-a-million dollars, in two transactions, one after each of the Company's announcements of its entry into agreements to acquire D-Vasive and Demonsaw assets, on May 9, 2016 and May 26, 2016 respectively. Defendant Ladd made his sales of Company stock at a perfect time, yet he had only made one sale of MGT common stock in the preceding nearly three years.

20.      **Defendant H. Robert Holmes** ("Holmes") has been a Company director since May 2012.  He is and at all relevant times was Chairman of the Board, Chairman of the Nomination and Compensation Committee (which was later split into two separate committees), and a member of the Audit Committee.  According to the 2016 Proxy Statement, as of July 28, 2016, Defendant Holmes beneficially owned 488,819 shares of the Company's common stock, which was 1.88% of the Company's outstanding stock.  Given that the price per share of the Company's common stock at the start of trading on May 18, 2016 was $5.23, Holmes beneficially owned $2.56 million worth of MGT stock.  Upon information and belief, Holmes is a resident of North Carolina.

21.      For the fiscal year ended December 31, 2015, Defendant Holmes received $30,000, all in cash, in compensation from the Company.

22.      **Defendant Michael Onghai** ("Onghai") has been a Company director since May 2012.  Onghai is and at all relevant times was Chairman of the Audit Committee, a member of the Nomination and Compensation Committee (which was later split into two separate committees), and a Company director.  According to the 2016 Proxy Statement, as of July 28, 2016, Defendant Onghai beneficially owned 336,000 shares of the Company's common stock, which was 1.29% of the Company's outstanding stock.  Given that the price per share of the Company's common stock at the start of trading on May 18, 2016 was $5.23, Onghai beneficially owned $1.76 million worth of MGT stock.  Upon information and belief, Onghai is a resident of New York.

23.     For the fiscal year ended December 31, 2015, Defendant Onghai received $25,000, all in cash, in compensation from the Company.

24.     Defendant Onghai is the CEO, Chairman, President, Secretary, one of only two directors, and the majority shareholder (54.5%) of LookSmart Group, Inc. ("LookSmart"). LookSmart completed a multi-million dollar merger with Pyxis Tankers Inc. ("Pyxis") in 2015. Defendant Ladd is a director on the Board of Pyxis. The past business dealings between LookSmart and Pyxis were not disclosed in the Company's filings during the Relevant Period.

25.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Onghai made the following sale of Company stock (and made no purchases of Company stock).  On May 18, 2016, Defendant Onghai sold 6,545 shares of Company stock for $5.33 per share, yielding proceeds of $34,884.

26.     The peculiar timing of Defendant Onghai's trades, especially in light of his trading history, makes the above described sale of Company stock unusual.  Defendant Onghai made his first ever sale of Company common stock immediately after the Company issued a promotional press release touting the D-Vasive Transaction (defined below), and at a time when the Company's stock was at a short-lived, but near all-time, high.

27.     Defendants Ladd, Holmes and Onghai, shall be collectively referred to as the "Director Defendants."

**Non-Party Former Director Defendants**

28.     ***John McAfee*** ("McAfee") was named the Company's next Executive Chairman and CEO on May 9, 2016.  Pursuant to the employment agreement ratified by MGT shareholders at their annual meeting on September 8, 2016, McAfee's appointment as the Company's CEO and

Executive Chairman will become effective upon the completion of the D-Vasive Transaction, at which time the Company purportedly intends to change its name to John McAfee Global Technologies, Inc.  MGT shareholders, at their annual meeting on September 8, 2016, elected Defendant McAfee to serve as a director of the Company.  According to the 2016 Proxy Statement, as of July 28, 2016, Defendant McAfee beneficially owned 6,000,000 shares of the Company's common stock, which was 23.07% of the Company's outstanding stock. Given that the price per share of the Company's common stock at the start of trading on May 18, 2016 was $5.23, McAfee beneficially owned $31.4 million worth of MGT stock.

29.     On August 21, 2017, MGT filed a Form 8-K with the SEC that reported that Defendant McAfee resigned as CEO and Executive Chairman of the Board effective August 16, 2017.   On January 26, 2018, MGT issued a press release and announced that it had ended its relationship with Defendant McAfee.

30.     **Nolan Bushnell** ("Bushnell") was a Company director since his appointment to the Board by the then-sitting members of the Board on or around June 7, 2016 until his resignation on May 31, 2018. He was a member of both the Audit Committee and the Nominations and Compensation Committee.   According to the 2016 Proxy Statement, as of July 28, 2016, Defendant Bushnell beneficially owned 150,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the start of trading on May 18, 2016 was $5.23, Bushnell beneficially owned $784,500 worth of MGT stock.

31.     In accordance with the Company's compensation policies, Defendant Bushnell is likely to receive $25,000 for the fiscal year ended December 31, 2016.

32.     **Defendant Joshua Silverman** ("Silverman) was a Company director from 2014 2014 until his resignation from the Board on May 6, 2016.  He was a member of both the Audit

Committee and the Nominations and Compensation Committee   For the fiscal year ended December 31, 2015, Defendant Silverman received $25,000, all in cash, in compensation from the Company.

**Relevant Non-Parties**

33.   ***Non-Party Barry C. Honig*** ("Honig") was a shareholder of MGT.  Honig owns GRQ Consultants, Inc. ("GRQ"), and co-owns, with John Stetson ("Stetson"), HS Contrarian Investments, LLC ("HSCI").

34.   ***Non-Party Stetson*** was a shareholder of MGT.  Stetson owns Stetson Capital Investments Inc. ("SCI"), and co-owns, with Honig, HSCI, of which he is the managing member.

35.   ***Non-Party Michael Brauser*** ("Brauser") was a shareholder of MGT.  Brauser owns Grander Holdings, Inc. ("Grander").

36.   ***Non-Party John O'Rourke III*** ("O'Rourke") was a shareholder of MGT. O'Rourke owns ATG Capital LLC ("ATG").

37.   ***Non-Party Mark Groussman*** ("Groussman") was a shareholder of MGT. Groussman owns Melechdavid, Inc. ("Melechdavid").

38.   Non-Parties Honig, Stetson, Brauser, O'Rourke, and Groussman are sometimes referred to herein as the "Control Group."

39.   Defendant Ladd and Non-Parties Honig, Stetson, Brauser, O'Rourke, and Groussman are referred to herein as the "Scheme Group."

## THE COMPANY'S CORPORATE GOVERNANCE

40.   As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

9

41.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

42.    During the Relevant Period, MGT maintained two director level committees; (1) Audit Committee, and (2) Nomination and Compensation Committee.  At some time during the Relevant Period MGT separated the Nomination and Compensation Committee into separate committees.  As a result, MGT presently has three director level committees; (1) Audit Committee, (2) Compensation Committee, and (3) Governance and Nominating Committee.

43.    MGT maintains charters for each of these committees.   Additionally, MGT maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), Anti-Fraud Policy, and Corporate Governance Guidelines, in addition to other governance documents.

44.    As stated therein, MGT's Code of Conduct applies to all of its directors, officers and employees and requires, among other things, compliance with all laws, rules and regulations applicable to the Company wherever it does business.  The Code of conduct prohibits insider trading and requires honest and ethical conduct and fair dealing.  It also requires that its employees, officers and directors must honestly and accurately report all business transactions.

45.    On information and belief, Plaintiff alleges that MGT originally adopted its anti-fraud policy on June 25, 2012.  However, the Anti-Fraud Policy that is presently available on its website (as of August 27, 2019) states that it was "Adopted by the Board of Directors on July 11, 2018."  The introduction in each policy is substantially similar; however, the 2012 version states that the Audit Committee provides oversight of management, where the 2018 version states that the Board of Directors provides oversight of management.  Both define fraud as ". . . deception by

an individual(s) to obtain unjust benefit or deception causing harm or loss to the company" – which is exactly what occurred in the present case. Both versions include sections on Fraud Risk Management and identify responsibilities of its directors, employees, and others.

## DUTIES OF DEFENDANTS

46.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of MGT, Defendants owed MGT and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage MGT in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of MGT and its investors.

47.     Each director of the Company owes to MGT and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

48.     To discharge their duties, the officers and directors of MGT were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of MGT were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and

disseminating truthful and accurate statements to the SEC and the investing public;

(b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how MGT conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(d)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(e)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

49.      Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MGT, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

**Honig, Stetson, Groussman, Brauser, and
O'Rourke Secretly Obtain MGT Shares**

50.     On September 26, 2015, Honig, Stetson, Groussman, Brauser, and O'Rourke (the "Control Group") initiated a pump-and- dump scheme in MGT.   Honig informed Stetson to "put together a term sheet for [MGT]" and outline the proposed terms of the arrangement.   Honig directed Stetson to send the proposal to Defendant Ladd, MGT's CEO at the time.

51.     The deal contemplated the issuance of 2.8 million MGT shares, along with warrants to acquire an additional 5.6 million shares, subject to a 4.99% conversion blocker.  This structure allowed investors to repeatedly convert and sell shares while appearing individually to stay below the 5% threshold at which Section 13(d) of the Exchange Act required public disclosure of holdings.  This ostensibly enabled Honig and his associates to conceal their participation in their illicit pump-and-dump scheme.

52.     Defendant Ladd knew of Honig and his associates' interest in, and control over, MGT.  On October 1, 2015, Defendant Ladd emailed Honig that "NYSE MKT wants to know the buyers.  $175,000 x 4 investors will be each at 4.9%" Honig  replied, copying Brauser and Stetson, that he would get back to him shortly with names but for now, to use "Barry Honig Mike Brauser OBAN [an LLC created by Stetson]."

53.     On October 5, 2015, Stetson provided MGT with names of investors who would participate in the financing, including entities held by Honig, Stetson, Groussman, Brauser, and O'Rourke. The Honig-led financing ultimately provided $700,000 to MGT.

54.     On October 9, 2015, MGT filed a Form 8-K with the SEC disclosing that the prior day, it had "entered into separate subscription agreements . . . with accredited investors. . . relating to the issuance and sale of $700,000 of units[.] . . ."

55.     MGT failed to disclose the names of Honig and his team in the Form 8-K, and no such Schedule 13D filing was made, in an apparent effort to conceal those Defendants' large ownership stake in MGT.

**MGT's Undisclosed Stock Promotion in January – February 2016**

56.     On or around January 21, 2016, by which time Honig, Stetson, Groussman, Brauser, and O'Rourke had acquired at least 16.3% of MGT's outstanding stock, Honig directed Ladd to wire $125,000 to a well-known stock promoter as up-front payment for the promotion of MGT.

57.     On February 3, 2016, an article was published online touting MGT's positive prospects in social and real money gaming sites and intellectual property relating to slot machines. The article did not disclose that its author had been paid by MGT, at Honig's direction, to write the article.  After the article was published, volume surged from 45,754 shares on February 2, 2016, to 3,250,272 shares on February 3, 2016 — a 7,000% increase.  The intraday stock price on February 3, 2016 rose 60% from the previous close.

58.     Following the February 3, 2016 article, Defendants Ladd,  Honig, Stetson, and O'Rourke sold over 430,000 shares for proceeds of around $198,800.

**MGT's Pump-and-Dump Scheme Involving McAfee in May 2016**

59.     To further capitalize on their MGT holdings, and in furtherance of the pump-and-dump scheme, Honig identified a potential acquisition target for MGT. O'Rourke, under Honig's direction and with the knowledge and consent of Groussman, Brauser, and Stetson, arranged a deal between MGT and McAfee.

60.     On March 29, 2016, O'Rourke sent Defendant McAfee a term sheet for the asset purchase of Defendant McAfee's company, D-Vasive Inc. ("D-Vasive"), by an "NYSE listed

company." D-Vasive provided anti-spy software. On April 3, 2016, D-Vasive indicated it was interested in a deal. That same day, O'Rourke asked Honig if he still wanted to pursue the deal, to which Honig replied, "Yea!"

61.    On April 4, 2016, O'Rourke introduced Defendant Ladd to Defendant McAfee to begin negotiating a transaction between MGT and Defendant McAfee's various business interests. O'Rourke and Honig helped orchestrate the deal, as evidenced by subsequent correspondence between Defendant Ladd and O'Rourke, and O'Rourke and Honig.

62.    On May 9, 2016, pre-market, Honig traded in MGT's stock to create the misleading appearance of market liquidity. Honig bought and sold small quantities of stock dozens of times, while Brauser and Groussman (and his entity) also engaged in coordinated trades with Honig in MGT stock during pre-market trading.

63.    Then, at 8:30 a.m. that same day, MGT announced in a press release that it had entered into an asset purchase agreement ("APA"), by and through its subsidiary, MGT Cybersecurity, for the purchase of certain technology and assets of D-Vasive Inc., a Wyoming corporation ("D-Vasive") (the "D-Vasive Transaction") and further providing that Defendant McAfee would be the proposed Executive Chairman and CEO. In return, MGT would provide D-Vasive with: (i) $300,000 in cash at the date of closing; (ii) 4,760,000 unregistered shares of common stock to be held in escrow pending satisfaction of the representations and warranties of the purchase agreement; and (iii) 19,040,000 unregistered shares of common stock at the date of closing.

64.    The press release further suggested Defendant McAfee would achieve success at MGT because he "sold his anti-virus company to Intel for $7.6 billion." This was false, as

Defendant McAfee's namesake company was not sold to Intel for that amount until long after Defendant McAfee's departure from the company.

65.     That same day, StockBeast.com, a well-known internet promotion website, published an article by an unnamed author, entitled, "MGT Capital Beastmode engaged – John McAfee driving the Bus[.]"   The article touted MGT and highlighted Defendant McAfee's involvement, repeating the materially false claim that Defendant McAfee had "sold his startup company to Intel for $7.6BB[.]"   The article proclaimed, "This is big big big!"

66.     On May 9, 2016, MGT's stock opened at $0.64, or $0.275 higher or 75% higher than its previous day closing price of $0.3647 on May 6, 2016.  More than 10 million shares traded, as compared to 71,005 on the prior trading day.  Nearly one week later, on May 17, 2016, the trading volume for MGT reached 109,384,614 shares and the stock closed at $4.15 per share.

67.     Then, on May 26, 2016, MGT announced its plan to acquire a second company in the cybersecurity sector, Demonsaw LLC ("Demonsaw"), a secure and anonymous file sharing software platform.  Under the terms of the asset purchase agreement, Demonsaw shareholders would receive 20 million restricted shares of MGT common stock, which required MGT to issue new shares.[2]

68.     Between May 9, 2016 and May 31, 2016, following the announcements of these deals, Defendant Ladd, Honig, Brauser, Stetson, Groussman, and O'Rourke sold over 9.3 million MGT shares for total proceeds of over $9.4 million. Defendant Ladd alone received over $516,544.08 in proceeds from the sale of 471,000 shares during this time.

---

[2]     On July 8, 2016, MGT issued a press release announcing the filing of a preliminary proxy statement, by which the two proposed acquisitions were simplified and "effectively combined into one" by "D-Vasive purchasing Demonsaw, with MGT buying the combined company pending stockholder approval."

69.     Honig freely accepted credit for his role in the transaction.  On May 12, 2016, Honig received an email from an investment firm congratulating him on the recent transaction, to which Honig responded that he was the "[l]argest shareholder, fund and relationship with [McAfee]."

70.     In early August 2016, Honig also admitted his undisclosed role at MGT in a chat with Stetson, stating "its great in [MGT] because we are behind the scenes."

71.     Honig, Stetson, Brauser, O'Rourke, and Groussman exercised control over MGT's management, including Defendant Ladd. This is evidenced by certain events: (i) on October 1, 2015, when Defendant Ladd asked for and received Honig's direction regarding how to disclose Honig's group's stock acquisitions; (ii) on or around January 21, 2016, when Honig directed Defendant Ladd to wire $125,000 to a well-known stock promoter as an up-front payment to promote MGT; and (iii) from March through May 2016, when O'Rourke, at Honig's direction, orchestrated the deal between Defendant McAfee and MGT.  Defendant Ladd did what he was told and sought approval regarding MGT's SEC filings and business practices.

## FALSE AND MISLEADING STATEMENTS

72.     Throughout the Relevant Period, MGT's stock was manipulated in furtherance of the pump-and-dump scheme and by Honig, Stetson, Groussman, Brauser, and O'Rourke's control of Defendant Ladd.

73.     On October 9, 2015, Defendants caused MGT to file a Form 8-K with the SEC disclosing that on October 8, 2015, it had entered into separate subscription agreements with accredited investors for the sale of $700,000 of units of MGT.  The Form 8-K did not disclose the names of the group of investors (Honig, Stetson, Groussman, Brauser and O'Rourke).  The 8-K stated in relevant part:

> On October 8, 2015, MGT Capital Investments, Inc. (the "Company") entered into separate subscription agreements (the "Subscription Agreement") with accredited

investors (the "Investors") relating to the issuance and sale of $700,000 of units (the "Units") at a purchase price of $0.25 per Unit, with each Unit consisting of one share (the "Shares") of the Company's common stock, par value $0.001 per share (the "Common Stock") and a three year warrant (the "Warrants") to purchase two shares of Common Stock at an initial exercise price of $0.25 per share (such sale and issuance, the "Private Placement").

74.     After the October 2015 financing had closed, Honig, Stetson, Groussman, Brauser, and O'Rourke failed to satisfy their obligation to file a Schedule 13D.  They owned at least 16% of the Company's shares, in addition to warrants which, if converted, would have resulted in Honig, Groussman, Brauser, Stetson, and O'Rourke controlling at least 42% of the total common shares outstanding at the time.

75.     On April 14, 2016, Defendants caused MGT to file a Form 10-K for the year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's full year 2015 financial results and position.  The 2015 10-K was signed by Defendant Ladd.  The 2015 10-K contained a signed certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Ladd, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

76.     MGT's 2015 10-K stated the Company's stock price was subject to volatility but failed to disclose it was being manipulated:

> ***Our stock price and trading volume may be volatile, which could result in losses for our stockholders***
>
> The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our Common stock. We cannot predict the potential impact of these periods of volatility on the price of our Common stock. The Company cannot assure you that the market price of our Common stock will not fluctuate or decline significantly in the future.  [Emphasis added].

77.     On May 9, 2016, Defendants caused MGT to issue a press release announcing its intended acquisition of D-Vasive, Defendant McAfee's sale of his anti-virus company to Intel for $7.6 billion, and his proposed appointment as Executive Chairman and CEO of MGT, stating in part:

### John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology

*Mr. McAfee to be Chairman and CEO of renamed John McAfee Global Technologies*

**HARRISON, NY (May 9, 2016)** MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that it has entered into a definitive asset purchase agreement to acquire certain technology and assets from D-Vasive Inc., a provider of leading edge anti-spy software. D-Vasive offers a powerful tool for protection from the proliferation of invasive apps by consumer products companies, social networks, financial institutions and others. These invasive apps can secretly turn on a phone's microphone and camera, as well as monitor geographic movements and access contacts. The D-Vasive technology operates in a unique way, allowing the user to manage and control the device's internal hardware. D-Vasive will be available shortly for Android and Windows platforms, followed by a release for Apple iOS.

***In conjunction with the acquisition, MGT is pleased to announce the proposed appointment of John McAfee as Executive Chairman and Chief Executive Officer. Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion, and is actively involved in the development of new measures to protect individual freedoms and privacy***. Mr. McAfee stated, "The enormous impact of cybersecurity on our lives requires the scale and resources of a public company. Our ability to continue to hire the best minds in the business will be vastly enhanced with a public platform. With the acquisition of D-Vasive technology as a starting point, we expect to grow MGT into a successful and major force in the space." MGT Capital also intends to change its corporate name to John McAfee Global Technologies, Inc.

Additionally, MGT has entered into a consulting agreement with Future Tense Secure Systems Inc., a technology incubator with investments in other applications requiring privacy, such as file sharing and chat. It is contemplated by the parties that future collaborations or investments may occur going forward.

Closing of the acquisition is contingent on customary conditions including approval by MGT's stockholders. Major terms of the deal include the payment to D-Vasive Inc. stockholders of 23.8 million restricted shares of MGT stock and $300,000 in

cash. The proposed share issuance is expected to amount to roughly 47% of the Company on a pro-forma fully diluted basis at closing. More detailed information can be found in the Company's Form 8-K filed this morning with the Securities and Exchange Commission, available at www.sec.gov, or the MGT website at www.mgtci.com. [Emphasis added].

78.     This press release was materially false, as Defendant McAfee's namesake company was not sold to Intel for that amount until long after his departure from the company.

79.     On April 20, 2017, Defendants caused MGT to file a Form 10-K for the year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's full year 2016 financial results and position.  The 2016 10-K was signed by Defendants Ladd and McAfee.  The 2016 10-K contained a signed SOX certification by Defendant Ladd, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

80.     MGT's 2016 10-K stated the Company's stock price  was subject to volatility but failed to disclose it was being manipulated:

> ***Our stock price and trading volume may be volatile, which could result in losses for our stockholders***.
>
> The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our common stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our common stock. We cannot predict the potential impact of these periods of volatility on the price of our common stock. The Company cannot assure you that the market price of our common stock will not fluctuate or decline significantly in the future.  [Emphasis added].

81.     On April 2, 2018, Defendants caused MGT to file a Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC, which provided the Company's full year 2017 financial results and position.  The 2017 10-K was signed by Defendant Ladd and MGT's Chief Financial Officer ("CFO") Lowrey.  The 2017 10-K contained signed SOX certifications by

Defendant Ladd and CFO Lowrey, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

82.     MGT's 2017 10-K stated the Company's stock price was subject to volatility but failed to disclose it was being manipulated:

> *Our stock price and trading volume may be volatile, which could result in losses for our stockholders*.
>
> The equity markets may experience periods of volatility, which could result in highly variable and unpredictable pricing of equity securities. The market price of our Common Stock could change in ways that may or may not be related to our business, our industry or our operating performance and financial condition and could negatively affect our share price or result in fluctuations in the price or trading volume of our Common Stock. We cannot predict the potential impact of these periods of volatility on the price of our Common Stock. The Company cannot assure you that the market price of our Common Stock will not fluctuate or decline significantly in the future.  [Emphasis added].

83.     The statements referenced above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants permitted or made false and/or misleading statements and/or failed to disclose that: (1) Defendants were engaged in a pump-and-dump scheme to artificially inflate MGT's stock price; (2) this illicit scheme caused MGT to make false and misleading statements, which would result in governmental scrutiny, including from the SEC; (3) certain MGT shareholders exercised control over MGT and its management; (4) consequently, the illicit pump-and-dump scheme would ultimately cause MGT's stock to become delisted from NYSE MKT; and (5) as a result, Defendants' statements about MGT's business and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH SLOWLY EMERGES

84.     On September 19, 2016, pre-market, Defendants caused MGT to issue a press release announcing that on September 15, 2016, MGT had received a subpoena from the SEC requesting "certain information from the Company."  MGT later admitted in a subsequent press release dated September 7, 2018 that this subpoena was related to the SEC's investigation into Defendant Ladd's involvement in the pump-and-dump scheme.

85.     On this news, shares of MGT fell $0.74 or 22.7% to close at $2.52 per share on September 19, 2016.

86.     On September 20, 2016, pre-market, MGT announced that the NYSE had informed the Company the previous day that it would "not approve the listing on the Exchange of the 43.8 million shares that the Company is required to issue in order to complete the closing of the D-Vasive [sic] merger."

87.     On this news, MGT's stock continued to fall $0.63 or 25% to close at $1.89 per share on September 20, 2016.

88.     On October 19, 2016, shortly before market-close, the NYSE MKT issued a press release stating "the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of MGT Capital Investments, Inc. from the Exchange. Trading in the Company's common stock on the NYSE MKT will be suspended immediately."  The press release further stated that "NYSE Regulation has determined that the Company is no longer suitable for listing" and had "commenced delisting proceedings pursuant to Section 1002(c) of the NYSE MKT Company Guide that applies when a company has sold or otherwise disposed of its principal operating assets, or has ceased to be an operating company."

89.     On October 20, 2016, Defendants caused MGT to issue a press release stating it was considering appealing the delisting and that MGT's common stock would begin trading OTC.

90.     On October 21, 2016, the next trading day following this news, MGT's stock fell

$1.07 or over 45% to close at $1.29 per share.

91.     On September 7, 2018, the SEC issued a press release entitled "SEC Charges

Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes."  The SEC made its

complaint    against    Defendant    Ladd    and    others,    available    on    its    website    at

https://www.sec.gov/news/press-release/2018-182.   The press release stated in relevant part:

> The Securities and Exchange Commission today charged a group of 10 individuals
> and 10 associated entities for their participation in long- running fraudulent
> schemes that generated over $27 million from unlawful stock sales and caused
> significant harm to retail investors who were left holding virtually worthless stock.
>
> ***According to the SEC's complaint, from 2013 to 2018, a group of prolific South
> Florida-based microcap fraudsters led by Barry Honig manipulated the share
> price of the stock of three companies in classic pump-and-dump schemes***. Miami
> biotech billionaire Phillip Frost allegedly participated in two of these three
> schemes. ***Honig allegedly orchestrated the acquisition of large quantities of the
> issuer's stock at steep discounts, and after securing a substantial ownership
> interest in the companies, Honig and his associates engaged in illegal
> promotional activity and manipulative trading to artificially boost each issuer's
> stock price and to give the stock the appearance of active trading volume.
> According to the SEC's complaint, Honig and his associates then dumped their
> shares into the inflated market, reaping millions of dollars at the expense of
> unsuspecting investors***.
>
> "As alleged, Honig and his associates engaged in brazen market manipulation that
> advanced their financial interests while fleecing innocent investors and
> undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior
> Associate Director in the SEC's Division of Enforcement. "They failed to
> appreciate, however, the SEC's resolve to relentlessly pursue and punish
> participants in microcap fraud schemes."
>
> ***The SEC's complaint, which was filed in federal district court in Manhattan,
> charges Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark
> Groussman,*** Frost, Elliot Maza, ***Robert Ladd***, Brian Keller, John H. Ford, Alpha
> Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian
> Investments LLC, Grander Holdings Inc., Melechdavid Inc., OPKO Health Inc.,
> Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital
> Investments Inc. with violating antifraud, beneficial ownership disclosure, and
> registration provisions of the federal securities laws and seeks monetary and
> equitable relief.  [Emphasis added].

92.     On this news, shares of MGT fell $0.195 or over 33% during the next two trading days to close at $0.395 per share on September 10, 2018, damaging investors.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

94.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

95.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

96.     Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

97.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

98.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

99.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

100.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

101.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein

## Defendant Ladd

103.    Defendant Ladd is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Ladd, as CEO and president, is an employee of the Company who derives substantially all of his income from his employment with MGT, making him not independent.  In its various public filings MGT acknowledges and admits that Defendant Ladd is not an independent director.

104.     Additionally, Defendant Ladd is a named defendant in the *SEC v. Honig et al.*, No. 18-cv-08175 (S.D.N.Y. Sept. 7, 2018) (the "SEC Action") action and other litigation arising from and relating to the matters alleged herein and faces a high likelihood of liability.

105.     As such, Defendant Ladd cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

**Defendant Onghai**

106.     At all relevant times, Defendant Onghai was Chairman of the Audit Committee.

107.     Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, to manage business and financial risk, and compliance with significant applicable legal, ethical, and regulatory requirements, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

108.     Defendant Onghai breached his fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to participate in the pump-and-dump scheme, permitted and allowed false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above.

109.     Defendant Onghai's large Company stock holding, worth approximately $1.75 million, is evidence of his interest in keeping the Company's stock price as high as possible. Additionally, his insider sale as alleged herein, made with knowledge of material non-public

information before the fraud was exposed, demonstrates his motive in facilitating and participating in the fraud.

110.    Therefore, Defendant Onghai faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

**Defendant Holmes**

111.    At all relevant times, Defendant Holmes was Chairman of the Board and a member of MGT's Audit Committee.

112.    Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, to manage business and financial risk, and compliance with significant applicable legal, ethical, and regulatory requirements, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

113.    Defendant Holmes breached his fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to participate in the pump-and-dump scheme, permitted and allowed false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above.

114.    Defendant Holmes large Company stock holding, worth approximately $2.5 million, is evidence of his interest in keeping the Company's stock price as high as possible.

115.    Therefore, Defendant Holmes faces a substantial likelihood of liability for his breach of fiduciary duties and any demand upon him is futile.

## COUNT I

### Against the Director Defendants for Breach of Fiduciary Duty

116.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

118.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

119.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

121.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

**COUNT II**

**Against the Director Defendants for Waste of Corporate Assets**

122.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

124.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

125.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

126.     Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT III**

**Against the Director Defendants for Unjust Enrichment**

127.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.     By their above-referenced wrongful acts and omissions, the Director Defendants were unjustly enriched at the expense of, and to the detriment of, MGT.

129.     The Director Defendants either benefitted financially from the improper conduct, including from insider sales and the receipt of unjust compensation linked to  false and

misleading statements, or received bonuses, stock options, or similar compensation from MGT that was linked to the financial performance or artificially inflated stock valuation of MGT, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

130.     Plaintiff, as a shareholder and a representative of MGT, seeks restitution from the Director Defendants and seeks an order from this Court disgorging all profits and remuneration of any type received by the Director Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

131.     Plaintiff on behalf of MGT has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)     Finding the Director Defendants liable for breaching their fiduciary duties owed to the Company;

(C)     Finding the Director Defendants liable for waste of corporate assets;

(D)     Finding that the Director Defendants were unjustly enriched by their wrongful acts;

(E)     Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(F)     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(G)     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 28, 2019

GAINEY McKENNA & EGLESTON

By:  */s/ Thomas J. McKenna*
       Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

31

## <u>VERIFICATION</u>

I, TYLER TOMCZAK, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of MGT Capital Investments, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of MGT Capital Investments, Inc. common stock at all relevant times.

TYLER TOMCZAK